BEER, Judge.
These five suits, consolidated for trial, deal with five separate agreements, each of which is labeled “Lease” even though each bears striking resemblance to a conditional sales agreement. Nevertheless, for the purposes of this opinion, the agreements will be treated as leases in accordance with Executive Car Lease Co. of New Orleans v. Alodex Corp., 279 So.2d 169 (La., 1973). In all of the agreements, the “lessee” of certain construction or automotive equipment is Family Pools, Inc., represented by its president, J. Stanley Middleton, Jr. The “lessor” in each instance is Louisiana National Leasing Corporation (hereafter “National Leasing”).
Each “lease” contains a “surety agreement,” the contents of which we shall discuss more fully hereafter. That surety agreement, in each instance, was executed by J. Stanley Middleton, Jr., individually, Sherard Fabacher, individually, and Peter Fabacher, individually.
Family Pools, Inc. failed, in all five separate instances, to make the timely installment payments (termed “rent”) which the various instruments required. Therefore, consecutively numbered suits were filed by National Leasing against the lessee and the sureties in the 24th Judicial District Court for the Parish of Jefferson, consolidated for trial, and, in all instances but one (docket number 160-297), decided in favor of plaintiff, National Leasing, and against Family Pools, Inc. and J. Stanley Middleton, Jr., individually. In all instances, National Leasing’s claim against Sherard Fabacher, individually, and Peter Fabacher, individually, was dismissed, as was National Leasing’s claim against all defendants in the case bearing docket number 160-297.
From those judgments, National Leasing has devolutively appealed, contending that the trial court erred in the dismissal of the claims against the Fabachers in all suits and further erred in the dismissal of that case bearing docket number 160-297.[1]
Apparent from its written reasons for judgment is a finding on the part of the trial court that the “lease,” which forms the basis for the suit bearing docket number 160 — 297, was terminated on January 19, 1973. That particular “lease” agreement contains a stipulation not found in the other four agreements. It provides that:
“Notwithstanding any action taken by Lessor, including taking possession of any or all of the equipment, Lessee shall *1159 remain liable for the full performance of all its obligations hereunder, but if Lessor terminates this lease in writing, as to any item of equipment, Lessee shall not be liable for rent for such item accruing after the date of such termination.”
Although the “lease” which is the threshold document for consideration of docket number 160-297 is not identical to the “leases” in the other four cases, the question of termination vel non is material to a full consideration of the legal issues raised in the other cases and is critical in docket number 160-297.
Expectedly, under the circumstances existent in this matter, there were considerable exchanges of correspondence and discussions between the various parties at interest which arose from the failure of Family Pools, Inc. to meet the payment schedule provided for in each particular “lease.”
However, notwithstanding those exchanges and various threats of termination of the agreements, the practical result of all the machinations between the parties was a Mexican stand-off. The terms of this armed truce, though never reduced to a formal agreement, amounted to a tacitly acceptable procedure whereby Family Pools, Inc., despite its default, continued to use the “leased” equipment and, contemporaneous with this, made some payments of “rent” to National Leasing when money was available. In other words, they kept using the “leased” equipment to try to make a profit from which additional “rent” payments could be made. All of the parties whose various interests are now being resolved by this litigation tacitly went along with this procedure. Thus, there was existent, in effect, a sort of continuing calculated gamble on the part of all concerned that Family Pools, Inc. would, if allowed to continue using the equipment, make some money, and, eventually, pay off the balance due under the “leases.” This describes the actual situation as of January 19, 1973 (and, incidentally, still the situation), even though certain letters admitted into evidence can, on their face, be construed differently. Thus, the trial court’s finding in docket number 160-297 that there was “no liability after termination — i. e., after January 19, 1973” is partially in error. Though we certainly agree with the trial court’s conclusion that liability for “rent” ceases after the date of termination of the “lease,” we must reject any conclusion that actual termination has ever, in fact, taken place.
All of the parties to the agreements, in one way or another, have tacitly acquiesced in the continuation of the relationships generally established by the original contracts. All parties to the agreements, at least to some perceptible extent, have continued to indulge in that most human desire to have one’s cake and eat it too. To visit the sting of literal interpretation on only one of those participants because of the form used in a letter warning of certain consequences if payment was not timely received, when the actual facts indicate that an arrangement, however temporary, improvised and fragile, had been worked out, would not be just. See Southern Fleet Leasing Corp. v. McAndrew, 219 So.2d 215 (La.App., 1st Cir., 1969). The record does not indicate to us that any of the parties, including the sureties, so conducted themselves as to be in a position to insist upon positive literal interpretation of any of the documents here involved, including the letter threatening termination, without any consideration of the actual facts which, as we have indicated, materially vary the verbiage of the documents.
We conclude that none of the “leases,” including the one that is involved in docket number 160-297, have been terminated in such manner as to extinguish the “lessee’s” liability for “rent.” Furthermore, that liability must also exist with respect to the sureties in all five agreements if we conclude that their general defensive contentions — sustained thus far by the trial court — are without merit.
*1160 Accordingly, we turn now to a consideration of the correctness of the trial court’s determination that Messrs. Fabacher are to be excused from their obligation as sureties.
Messrs. Fabacher were signatories, as “guarantors,” along with J. Stanley Middleton, Jr., of a “surety agreement” that forms a part of each “lease.” That agreement reads as follows:
“In consideration of the Lessor entering into this lease with the Lessee, the undersigned hereby guarantees and becomes surety for the Lessee in favor of the Lessor for the full and faithful performance of all Lessee’s obligations under this lease. This obligation of the undersigned surety is joint, several and in solido with the Lessee. The undersigned shall be bound as if principal obligors for all amounts due under this lease, both for the basic term and for the continued month to month basis thereafter, and consents in advance to all extensions. The undersigned renounce any plea and benefit of discussion or division granted by law to sureties; it is understood and agreed that without this guarantee or surety agreement, Lessor would be unwilling to enter into this contract of lease with the Lessee.”
When the five consecutively numbered suits were filed in the 24th Judicial District Court, the Fabachers were sued in their surety-guarantor capacity. In answers, they admitted the signing of the surety agreements but alleged in their answers that the agreements had been breached by Family Pools, Inc. in various ways.
Much is made by all litigants regarding the procedural manner by which these surety-guarantor defendants have confected their pleadings and attempted to set up their affirmative defenses. Procedural requirements should be construed on a liberal basis to serve the proper administration of justice. In these circumstances, we find that the trial court’s willingness to permit the introduction of certain testimony on the part of the sureties to be essentially correct, regardless of the form of their pleadings and regardless of the strenuous objections by able counsel for the “lessors.”
Nevertheless, we take serious note of the fact that a surety’s duty to specify and affirmatively prove his defenses signals more than a procedural hedge against unfair surprise.
Essentially, it signals that a surety is one who has embarked upon a solemn— indeed onerous — undertaking and, however well intentioned and unselfish were his motives in assisting his friend, the principal, it is all business as far as the obligee is concerned. Thus, any subsequent efforts on the surety’s part to rid himself of this solemn obligation must be manifested in an affirmative and unequivocal manner, with the burden to overcome the obligation clearly and emphatically borne by the surety. It will not do for a surety to stand by and, at his pleasure or convenience, simply interpose those various defensive contentions which .may, in time, occur to him or as opportunity may seem to offer. His burden is such that he must sound the charge — loud and clear — when he seeks to set aside his previously granted unconditional guarantee. For, it was this unconditional guarantee that must be assumed to be the bedrock reason for the obligee being willing — in the first place— to do business with the principal.
An act of suretyship is not a mere pleasantry bestowed upon serious business proceedings. It is no unexpected but gratefully accepted windfall. It is a positive act of guarantee that has been fully and completely counted upon from the inception of the obligation that it assures and, indeed, is very often (as here) the basic catalyst of the transaction. Once it is demonstrated that a surety has properly assumed his role, the time lock tumblers fall loudly into place and only the most direct, compelling and affirmative action can hope to undo what has been done. Although sure-tyship may first appear to be a carefree *1161 spring maiden, she can — overnight—become a grasping, wintry shrew. Those who would — for whatever reasons — dally with her fatal charms must be prepared to experience the sting of total disillusionment when the principal fails to respond.
As knowing sureties, fully aware of their obligations, Messrs. Fabacher took no positive affirmative action that would have precipitated a showdown with the other parties to these transactions after the original default by Family Pools, Inc. They had but, essentially, ignored the opportunities to precipitate such proceedings as would have caused the final determination of a liquidated amount which would, as of such determination, constitute the total maximum exposure on their part as sureties. They knowingly participated in the best-of-both-worlds-hope that, in time, Family Pools, Inc. would pay off the debts. For, though their clear-cut exposure as sureties could, perhaps, have been lessened by a prompt seizure and subsequent sale of the equipment after original default, their exposure was, nevertheless, also being continuously reduced by the sporadic payments which were coming in from Family Pools, Inc. in return for continued use of the equipment. We believe that their original commitment as sureties was sufficiently clear and sufficiently onerous under the terms of the agreements to oblige affirmative action on their part to protect their interests rather than the obvious wait-and-see attitude that the record discloses. The affirmative defensive contentions which they make in their answer come too late in the day to have more than a hollow sound. For them to avail themselves of the “lease” provisions that they now seek to use as shelter required an affirmative effort on their part at a time when actions spoke louder than words. Thus, it is not sufficient to have orally requested National Leasing to take such steps as would protect them (the Fabachers) from loss. The burden was upon them to affirmatively precipitate a seizure and sale or — at the very least — to take such affirmative legal action as was necessary to cause National Leasing to commence the protective procedures formally provided for in the agreements.
Having concluded that the “lease” agreement has not terminated, we also conclude that there has been no termination of that continuing guarantee to which the Fabach-ers are signatories. Whatever impurities exist with respect to the manner in which National Leasing has conducted its affairs are just as existent with respect to the conduct of Messrs. Fabacher. We find nothing in this record to support a thesis upon which the Fabachers, who were content to wait and see what would happen in lieu of taking any affirmative legal action in their own behalf, are entitled to greater protection than National Leasing, who proceeded in a manner somewhat inconsistent with the specific terminology of the “leases.” We see no support in the record for a finding that any of the parties deluded or hoodwinked one another though there may be some basis for a conclusion that, at least chronologically, everybody was not informed of everything at exactly the same time. It is, nevertheless, obvious from the record that the sureties were generally aware of the informal arrangement between National Leasing and Family Pools, Inc. which had, essentially, extended the original contracts.[2]
By answer to the appeal, Messrs. Fabacher seek judgment against J. Stanley Middleton, Jr. and Family Pools, Inc. “as expressed in the third party demand filed in these proceedings, and only to the extent to which said judgment may be modified in the appellate court casting appellees (the *1162 Fabachers) in any judgment to the original plaintiff herein.”
Our review of the record indicates that notification of such devolutive appeal was served on Family Pools, Inc. and Stanley Middleton through Dudley A. Phillips, Jr., on April 10, 1975, but there are no appearances in this court by or in behalf of those parties.
In their brief, counsel for Messrs. Fabacher make no reference to the situation as between themselves and Family Pools, Inc. and Middleton. However, we conclude that, by operation of law, the rights of Messrs. Fabacher are entitled to be preserved as against Family Pools, Inc. as principal and Middleton as cosurety.
Accordingly, the judgment of the 24th Judicial District Court for the Parish of Jefferson, dated January 20, 1975, must be amended and recast as follows :
It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Louisiana National Leasing Corporation, and against the defendants, Family Pools, Inc., J. Stanley Middleton, Jr., She-rard Fabacher and Peter Fabacher, jointly and in solido, in the full sum of $72,020.80,[3] together with legal interest thereon from date of judicial demand until paid, plus an additional twenty percent of said amount as attorneys’ fees, and for all costs of these proceedings, subject to a credit in the amount of $16,491.67, plus any additional amount paid to Louisiana National Leasing Corporation by Family Pools, Inc., J. Stanley Middleton, Jr., Sherard Fabacher or Peter Fabacher in satisfaction of the “rents” due under the terms and provisions of the “lease” agreements between the parties.
It is further ordered, adjudged and decreed that there be judgment herein in favor of Sherard Fabacher and Peter Fabacher against J. Stanley Middleton, Jr. and Family Pools, Inc., jointly and in solido, for such amounts as they may ultimately be obliged to pay, as sureties, to Louisiana National Leasing Corporation under the terms and provisions of those certain “leases” which form the basis for that judgment set forth in the next preceding paragraph of this decree.
Thus amended, the judgment is affirmed. Each party is to bear its own costs of this appeal.
AMENDED, RECAST AND, AS AMENDED AND RECAST, AFFIRMED.

. When the district court rendered its “Judgment” in these consolidated cases, it did not specifically deal with docket number 160-297 except with respect to reservation of certain rights on the part of the plaintiff. Nevertheless, it is obvious from the amount of the judgment in favor of plaintiff, Louisiana National Leasing Corporation, and against defendants, Family Pools, Inc. and J. Stanley Middleton, Jr., in the amount of approximately $62,000.00, that the claim set forth in docket number 160-297 was disallowed because the total demand in all five suits was approximately $72,000.00, and the total demand in docket number 160-297 was approximately $10,000.00, leaving a difference of approximately $62,000.00.

. The Fabachers’ oral representation that they requested National Leasing to seize and sell the equipment, even if unquestioned, was little more than a gesture in view of their actual knowledge of the continuing arrangement between National Leasing and Family Pools. As acknowledged, by witness Chiek under cross-examination by Fabachers’ able counsel, they (the Fabachers) had actual knowledge of each of the payments made, after default, by Family Pools.

. The amount of the original judgment plus $9,826.36, which is the amount claimed in docket number 160-297.